**UNISYS CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–706C.**

United States Court of Federal Claims.

Jan. 9, 2001.

Richard J. Webber, Washington, DC, attorney for Plaintiff. Anne H. Warner, McLean, Virginia, of counsel.

R. Alan Miller, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for Defendant. Judith Rabinowitz, Assistant Director, of counsel.

## OPINION

MEROW, Senior Judge.

This government contracts case concerns whether a refund of contingency payments is due to plaintiff under the terms of a settlement agreement between the parties. The matter is before the Court on cross-motions for summary judgment. Plaintiff contends that the only reasonable interpretation of the settlement agreement requires the government to refund any payment in excess of the amount specified. Defendant argues that the parties never intended for a refund to be made and that the agreement should be interpreted accordingly. For the reasons stated below, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied.

## BACKGROUND

The following facts are undisputed. Plaintiff Unisys Corporation ("Unisys") entered into a Settlement Agreement ("agreement") with the United States, dated September 6, 1991, to resolve several allegations of fraud in the performance of government contracts. The agreement provided, among other things, that Unisys would make "contingency payments" to the government.

The amount of the payments is set out in paragraph 1.c.ii of the agreement as follows:

> For the years 1993 through 1997, contingency payments will be equal to (a) seven and one-half percent (7.5%) of the Net Proceeds from Asset Sales which are closed by Unisys in the given year, plus (b) twenty percent (20%) of that year's Available Net Income.

This case concerns the contingency payments based upon Available Net Income. Payments contingent upon asset sales are not in dispute.

The agreement defines Available Net Income in paragraph 1.c.iii:

"Available Net Income" means "net earnings" as set forth in the consolidated statement of income included in Unisys' Quarterly Report of Form 10–Q or its Annual Report on Form 10–K after deducting Allowable Preferred Dividends.

Paragraph 1.c.v further addresses the contingency payments:

Contingency payments will be calculated quarterly and are due within fifteen (15) days following the date on which Unisys files its Form 10–Q or Form 10–K, except that contingency payments for the 1991 first quarter and second quarter will be due on October 7, 1991. To the extent that the quarterly Available Net Income calculations result in the United States receiving more or less than it would receive if Available Net Income were calculated annually, Unisys will adjust the fourth quarter payment due to the United States so that the sum of all payments for each year equals the amount that would be due the United States if payment had been calculated on an annual basis. There will be no interest due on contingency payments paid timely under this provision.

This dispute concerns contingency payments for the years 1994 and 1997. For the first three quarters of 1994, Unisys made quarterly contingency payments of $12.54 million based upon the Available Net Income of $62.7 million reported on Unisys' 10–Q's. In the fourth quarter of 1994, Unisys reported a loss of $82.3 million, resulting in an overall loss of $19.6 million in Available Net Income for the year. Therefore, Unisys did not owe a payment for the fourth quarter. Unisys contended that it was also entitled to a refund of the amount already paid based on its interpretation of the adjustment provision of paragraph 1.c.v. On January 31, 1995, Unisys made a written request for a refund of $12,121,539, consisting of the $12.54 million in quarterly payments less $418,461 owed to the government for asset sale payments.

In a letter dated March 31, 1995, the government responded that it believed that it had no obligation to refund the contingency payments to Unisys, except perhaps following the final year of the agreement. Instead, the government gave Unisys a credit towards payments for the following year. Thus, Unisys deducted the $12,121,539 from its payments to the government for 1995.

For the first three quarters of 1997, Unisys made quarterly contingency payments to the government totaling $5.52 million. In the fourth quarter of 1997, Unisys reported a loss of $992.3 million, which resulted in an overall loss of Available Net Income of $964.7 million for the year. Again, Unisys owed no payment for the fourth quarter, and contended that it was entitled to a refund of the quarterly payments.

In letters dated February 24 and April 2, 1998, Unisys requested a refund of $5.52 million. By letter dated April 30, 1998, the government responded that it believed that Unisys was not entitled to a refund. In the letter, the government argued that the agreement provided for Unisys to adjust its fourth quarter payment to the United States, but did not provide for a refund to Unisys. The government further contended that the credit given to Unisys in 1995 was erroneous and that Unisys was required to pay back $12,121,539.

On September 4, 1998, Unisys filed a complaint in this Court alleging breach of contract and seeking a refund of the $5.52 million paid in 1997. The government filed a counterclaim for the $12,121,539 credited in 1995. The parties have cross-moved for summary judgment.

## DISCUSSION

### A. Summary Judgment Standards

Summary judgment is appropriate when there are no genuine disputes over material facts and the moving party is entitled to prevail as a matter of law. RCFC 56(c); *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). In cases in which both parties move for summary judgment, each party bears the burden of demonstrating the absence of disputes of material facts in its own case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genu-

ine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, in order to prevail upon a motion for summary judgment, a party must demonstrate that no facts exist which would change the outcome of the litigation under the substantive law governing the suit. *See id.* at 248, 106 S.Ct. 2505.

### B. Merits

■■■■ A settlement agreement is a contract, and its interpretation is a matter of law. *See Mays v. United States Postal Serv.*, 995 F.2d 1056, 1059 (Fed.Cir.1993). Contract interpretation begins with the plain language of the agreement. *See Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed.Cir.1998). If the contract language is clear and unambiguous, a court will give the words their plain and ordinary meaning and will not resort to extrinsic evidence. *See Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed.Cir.1997); *Wright Runstad Props. Ltd. P'shp. v. United States*, 40 Fed.Cl. 820, 824 (1998).

■■■■ Both parties contend that the contract language is clear and unambiguous, but offer differing interpretations. Whether a contract provision is ambiguous is a question of law. *See Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993). If more than one meaning is reasonably consistent with the contract language, then the contract term is ambiguous. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996); *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed.Cir. 1993). However, if there is only one reasonable interpretation, then the contract term is unambiguous. *See id.* If the contract is unambiguous, the court's inquiry is at an end and the plain language of the contract controls. *See Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed.Cir.1998); *Bristol–Myers Squibb Co. v. United States*, 48 Fed. Cl. 350, 354–55 (2000).

■■■■ Paragraphs 1.c.ii and 1.c.v of the agreement describe the contingency payments at issue here. These two paragraphs must be construed so that "no contract provision is made inconsistent, superfluous, or redundant." *Lockheed Martin IR Imaging Sys. v. West*, 108 F.3d 319, 322 (Fed.Cir. 1997); *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996). Paragraph 1.c.ii requires that Unisys pay "twenty percent (20%) of that year's Available Net Income" to the government. Paragraph 1.c.v. details the process for making the payments. Under this paragraph, Unisys makes quarterly contingency payments based upon its Annual Net Income as reported on Form 10–Q. The crux of this dispute concerns the year-end adjustment mechanism:

"To the extent that the quarterly Available Net Income calculations result in the United States receiving more or less than it would receive if Available Net Income were calculated annually, Unisys will adjust the fourth quarter payment due to the United States so that the sum of all payments for each year equals the amount that would be due the United States if payment had been calculated on an annual basis."

In both 1994 and 1997, Unisys made contingency payments to the government based on a positive Available Net Income for each of the first three quarters. However, in both years Unisys reported a loss in the fourth quarter such that Available Net Income for the year was a loss. Unisys contends that the adjustment mechanism in paragraph 1.c.v., read in conjunction with the language of paragraph 1.c.ii, requires the government to refund the quarterly payments in this situation. Unisys argues that under paragraph 1.c.ii it owes the government 20% of annual Available Net Income, and that if annual Available Net Income is a loss then Unisys owes nothing to the government for that year. Unisys further argues that under paragraph 1.c.v Unisys adjusts the fourth quarter payment so that the total payment for the year is equal to "the amount that would be due to the United States if payment had been calculated on an annual basis." Because annual Available Net Income for 1994 and 1997 was a loss, the amount Unisys would pay on an annual basis is zero. Thus, Unisys claims that the only way to adjust the

fourth quarter payment so that the total payment Unisys makes to the government for the year is zero is for the fourth quarter payment to be negative, in other words, a refund of the quarterly payments already made.

Unisys' reading is a reasonable, although somewhat forced, interpretation of the agreement. It reconciles the language of paragraphs 1.c.ii and 1.c.v and gives a reasonable meaning to all parts of the agreement. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991).

The government does not offer another reasonable interpretation of the agreement. The government's position is that Unisys is not entitled to a refund of any quarterly payments made. In support of this position, the government relies heavily on the fact that while the agreement has several provisions about payments by Unisys to the government, it does not contain any language about a payment by the government to Unisys. Specifically, the government argues that paragraph 1.c.v refers only to adjusting the "payment due" to the United States and that a payment due cannot be a refund. However, this interpretation leads to results that are flatly inconsistent with other language in the agreement. Paragraph 1.c.ii requires that "contingency payments will be equal to...(b) twenty percent (20%) of that year's Available Net Income." Paragraph 1.c.v requires that "the sum of all payments for each year equals the amount that would be due the United States if payment had been calculated on an annual basis." If annual Available Net Income is a loss after a quarterly payment based on positive Available Net Income in any quarter, then the government must refund the quarterly payment in order to satisfy the above language. The agreement must be read so that "no contract provision is made inconsistent, superfluous, or redundant." *Lockheed*, 108 F.3d at 322; *McAbee*, 97 F.3d at 1435. Under the government's reading, portions of both paragraph 1.c.ii and 1.c.v are rendered meaningless.

Nevertheless, the government argues that the parties did not intend for the government to refund any money to Unisys. The government contends that during the contract negotiations Unisys was informed that the money would "flow only one way" and that no refunds would be issued. Thus, the government's position is that the parties understood that there would be no refunds when they entered into the agreement. This position is entirely different from the interpretation the government followed during the course of the contract. The government did in fact give Unisys a credit for the quarterly payments made in 1994. "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." *Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562, 1566 (Fed.Cir. 1987). Both the language of the agreement, drafted by the government, and the conduct of the parties during the agreement indicate that the parties did not intend that no refunds would be made. The government's interpretation of the agreement is unreasonable.

When there is only one reasonable interpretation of the contract, the agreement is unambiguous and the plain language of the agreement controls. *See Textron*, 143 F.3d at 1468. Under the plain language of the agreement, Unisys is entitled to keep the 1995 credit and is entitled to a refund of the 1997 quarterly payments.

### CONCLUSION

For the reasons stated above it is **ORDERED**:

(1) That Defendant's Motion for Summary Judgment is **DENIED**;

(2) Plaintiff's Motion for Summary Judgment is **GRANTED**;

(3) Defendant's counterclaim shall be **DISMISSED** and the Clerk is directed to enter judgment for the Plaintiff in the amount of $5.52 million with no costs to be assessed.